IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| JANIS MARIE JOHNSON, <br>     Plaintiff, <br><br> v. <br><br> COMMISSIONER OF SOCIAL SECURITY, <br>     Defendant. | Case No. 4:13-cv-04100-SLD-JEH |

### Report and Recommendation

Now before the Court is the Plaintiff's, Janis Marie Johnson's, Motion for Summary Judgment (Doc. 10) and the Commissioner of Social Security's, Carolyn W. Colvin's, Motion for Summary Affirmance (Doc. 13). The Plaintiff appeals from the denial of her application for Social Security Disability Insurance Benefits under Title II of the Social Security Act. 42 USC § 405(g). This matter has been referred for a Report and Recommendation. Text Order entered March 11, 2014. The Motions are fully briefed, and for the reasons stated herein, the Court recommends that the Commissioner's Motion for Summary Affirmance be GRANTED and the Plaintiff's Motion for Summary Judgment be DENIED.[1]

**I**

On June 14, 2006, Johnson filed a Title II application for disability insurance benefits. (AR 99). In her application, Johnson alleged disability beginning on January 10, 2005. (AR 99). Her earnings records showed that the claimant had acquired sufficient quarters of coverage to remain insured through June 30, 2006. (AR 11, 741). The claim was denied initially on September 28,

---

[1] References to the pages within the Administrative Record will be identified by AR [page number]. The Administrative Record appears at (Doc. 5) and (Doc. 6) on the docket.

1

2006, and was then denied upon reconsideration on December 8, 2006. On January 22, 2007, Johnson filed a timely request for hearing concerning her application for disability insurance benefits. (AR 64). A hearing was held before the Honorable John M. Wood (ALJ) on April 8, 2009, during which time Johnson was represented by a non-attorney. (AR 24). Following the hearing, the ALJ rendered an unfavorable decision on June 25, 2009. (AR 11-19). Johnson's request for review by the Appeals Council was denied on March 19, 2010. (AR 1). Johnson thereafter filed the matter in the United States District Court for the Central District of Illinois. After the parties entered into a joint stipulation for remand to the Commissioner, the Court entered an order remanding the case under sentence 4 of 42 USC § 405(g) and reversing the agency's decision on February 18, 2011. (AR 831). The Court ordered that upon remand, the agency was to consider the combined impact of all of Johnson's impairments and weight, to consider medical evidence of record including medical source opinions, and to consider Johnson's credibility. (AR 831). The Court further ordered that, if necessary, the Appeals Council had to remand the case for further development before an ALJ. (AR 831).

On September 22, 2011, the Appeals Council remanded the case back to an ALJ. (AR 837-39). A supplemental hearing was held before the same ALJ, Wood, on May 1, 2012, during which time Johnson was represented by an attorney. (AR 760). Following the supplemental hearing, on May 18, 2012 the ALJ determined that Johnson was not disabled through the date last insured (June 30, 2006). (AR 750). The Appeals Council refused to assume jurisdiction in a decision dated September 11, 2013. See (Doc. 10-1 at pg. 3).[2] Thus, the ALJ's decision of May 18,

---

[2] This information is taken from Johnson's Memorandum of Law in Support of Motion for Summary Judgment. As the Commissioner does not indicate otherwise, the Court takes the information as accurate.

2012 is the final decision of the Commissioner. Johnson filed the instant civil action seeking review of the ALJ's decision on November 7, 2013.

## II

At the time she applied for benefits, Johnson was a 50 year old married woman living with her husband in Roseville, Illinois. (AR 99-101). She received an Associate Degree in nursing and previously worked as a Registered Nurse. (AR 27, 890-93). She has been diagnosed with fibromyalgia, a degenerative back disorder, obesity, and depression. (AR 135, 425, 252, 666). She was employed as a nurse at the time she resigned in January 2005. (AR 28). In 2006, during the period under review, the Plaintiff worked briefly at Cottage Home Options, a home health agency, as a pediatric nurse taking care of children in their homes. (AR 28). She stayed at Cottage Home Options for only a matter of weeks until she stopped that work. (AR 28).

At the first hearing before the ALJ on April 8, 2009, Johnson testified that she resigned from the job she had in 2005 because she was battling depression and could not get it resolved. (AR 29). She testified that she had become friends with her boss, but then her boss began to act towards Johnson as if Johnson could do nothing right. (AR 33). Johnson testified that she stuck it out with that boss for three months but her boss's treatment towards her contributed to her leaving her job in January 2005. (AR 33). She testified that the depression hung on for another year after she quit her job in January 2005. (AR 34). Johnson testified that her depression finally resolved itself after about two and a half years. (AR 31). She also testified that the medicine combination of Elavil and nortriptyline took four months on that drug combination, and her depression finally got straightened out. (AR 32). She said she was put on nortriptyline in November of 2005. (AR 34).

She testified that she left her job in 2006 due to back pain. Specifically, the Plaintiff testified that she woke up on March 20, 2006 with back problems and that her back has been in pain ever since. (AR 29-30). At the time of the hearing, April 2009, Johnson said that she was in constant pain from the time she woke up in the morning to the time she went to bed at night. (AR 29). She said she could not sit for very long, and that she laid down most of the day because she could not sit in the recliner anymore or a soft chair of any kind. (AR 29). Though she was once an organist at her church, Johnson testified that she had to resign from that due to her back pain. (AR 35). She said she was not even able to attend church because of the sciatic pain but that Dr. McManus started her on lidocaine patches so that she was able to sit a little better and was able to go back to church three out of four weeks. (AR 36). She also testified to previous treatments for her back pain including cortisone shots, the first in March 2006, epidurals, the first in June 2006, and physical therapy. (AR 38). None of which, she said, worked. (38).

Johnson testified that she backed off from regular housework after she had a Discogram[3] on January 2, 2007, and that maybe even before then she had backed off from regular housework. (AR 37). She said that it was after the date of the Discogram that seemed to be the cutoff of most activities for her. (AR 37). She also testified that on August 21, 2007, she tried pelvic traction at physical therapy which made her back pain even worse and the pain became constant. (AR 30-31). On November 9, 2007, a spinal cord stimulator was surgically implanted in Johnson's back, which she said provided her 20% relief. (AR 40). Finally, the Plaintiff testified, "I always get up and around and do stuff because if

---

[3] A test used to evaluate back pain which involves the injection of a dye into the soft center of spinal disks. www.mayoclinc.org/tests-procedures/Discogram/basics/definition/prc-20013848 (visited Feb 13, 2015).

4

I don't the pain is worse. I have to get some -- you know I have to move. Whether it be, you know, doing laundry or some dishes or something. I can't just lay in bed." (AR 41). She said that she did maybe one load of laundry per day because the more she would bend and stretch, the worse her back and leg pain would get. (AR 41).

At the supplemental hearing before the ALJ on May 1, 2012, Johnson did not provide any further testimony. (AR 760-76). Rather, ALJ Wood posed his hypothetical questions to the Vocational Expert (VE), George Paprocki (Paprocki). The ALJ posed as his first hypothetical question to Paprocki:

> [A]ssume the past work same as the claimant's; exertional capacity limited to light work; no climbing of ladders, ropes, or scaffolds; other postural functions could be performed occasionally; only occasional pushing or pulling with the lower extremities; need to avoid concentrated exposure to extreme temperatures; need to avoid exposure to environmental hazards such as unprotected heights and dangerous machinery; limitation to the performance of simple or repetitive tasks that involve little or no change in work routine.

(767). Paprocki responded that Johnson's past work would be out. (AR 767). The ALJ asked Paprocki to add the vocational factor of "closely approaching advanced age." The ALJ asked whether, with regard to all of "those vocational factors," there would have been any unskilled, light jobs in the national and/or regional economy that such a person could have performed with no transfer ability of skills. (AR 768). Paprocki replied that the following were representative jobs that could be performed by such a person: housekeeping cleaner; office helper; and photocopy machine operator. (AR 768-70). The ALJ further questioned whether those representative jobs provided one with the opportunity to be able to meet the competitive work production standards of an employer on a per shift as opposed to a per hour basis. (AR 770). Paprocki responded that, "Basically, that's the case" and that there would be some latitude

5

for speeding up, slowing down, and doing jobs differently. (AR 771). The ALJ also asked whether there was any latitude with regard to how the representative jobs were performed with regard to alternating sitting and standing to any extent other than what is normally associated with light work. (AR 771-72). Paprocki responded that the cleaning jobs would not have much in the way of any latitude beyond anything other than standing posture. (AR 772).

### III

In his written decision, the ALJ applied the standard five-step sequential evaluation process and ultimately found that Johnson was not disabled through the last date she was insured, June 30, 2006. (AR 750). The ALJ determined that Johnson satisfied Step One because she had not engaged in substantial gainful activity during the period since her alleged onset date of January 10, 2005. (AR 743). At Step Two, the ALJ found that Johnson suffered from the following severe impairments: fibromyalgia, a degenerative back disorder, obesity, and depression. (AR 743). At Step Three, the ALJ found that the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (AR 743-44). Specifically, the ALJ found that Johnson's back condition did not satisfy Listing 1.04 (Disorders of the spine) because Johnson retained the ability to ambulate and perform fine and gross movements effectively and because the record did not establish the requisite items.[4] (AR 744). The ALJ further found that that

---

[4] Listing 1.04 includes disorders of the spine "resulting in compromise of a nerve root (including the cauda equine) or the spinal cord. With: Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or Lumbar spinal stenosis resulting in pseudo claudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular

Johnson's mental impairment did not meet or medically equal the criteria of listing 12.04 (Affective Disorders) where Johnson did not meet the "paragraph B" criteria. (AR 744). The ALJ determined that Johnson had mild restriction in activities of daily living, mild difficulties in social functioning, moderate difficulties with regard to concentration, persistence, or pace, and experienced one to two episodes of decompensation, each of extended duration. (AR 744). The ALJ also determined that the evidence failed to establish the presence of the "paragraph C" criteria. (AR 744).

The ALJ found that Johnson had the residual functional capacity (RFC) to perform light work as defined in 20 CFR § 404.1567(b)[5] except she could not climb ladders, ropes, or scaffolds, she could occasionally climb ramps or stairs and occasionally balance, stoop, kneel, crouch or crawl, she could occasionally push/pull with her lower extremities, she had to avoid concentrated exposure to extreme temperatures and hazards, and she was limited to simple and repetitive tasks involving little or no change in work routine, with the flexibility to meet the competitive work production standards of an employer on a per-shift rather than a per-hour basis. (AR 744-45).

In making his RFC determination, the ALJ considered Johnson's medical records, her Disability Report, her Activities of Daily Living Questionnaire, her hearing testimony, and State Agency Reports. Specifically, the ALJ discussed the Plaintiff's complaints of lower back pain, the extent to which her pain was exacerbated by activities such as standing, walking, bending, carrying, reaching,

---

pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b. 20 CFR Part 404, Subpart P, Appendix 1.

[5] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities . . . ."

7

and twisting, and the worsening of Johnson's back pain following the January 2007 Discogram and August 2007 pelvic traction which she said resulted in the cessation of most of her daily activities. (AR 745). The ALJ explained that both the Discogram and pelvic traction occurred after the expiration of Johnson's date last insured and could not be considered in assessing her work capacity prior to June 2006. (AR 745).

In finding that Johnson's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible, the Court first pointed out that this case was complicated by one factor that Johnson's severe impairments impacted her separately at different times and a second factor that her date last insured expired on June 30, 2006. (AR 745). In regard to the first factor, the ALJ explained that for purposes of efficiency, he would afford Johnson every benefit of the doubt by considering her back pain and depression together for the period at issue. (AR 746). Though he particularly noted that if Johnson's own pronouncements about the onset of her back pain and depression were taken at face value, there would be no overlap as she said her severe depression resolved in the first part of March 2006 and her severe back impairment was incurred on March 20, 2006. (AR 746). The ALJ explained how a limitation to light work and exclusion of climbing ladders, ropes, or scaffolds accommodated Johnson's joint problems and limitations secondary to obesity, and he explained how avoiding concentrated exposure to extreme temperatures and hazards accommodated the claimed exacerbation of pain in cold or heat and drowsiness from medications. (AR 746).

In not finding that Johnson was completely disabled between January 2005 and June 2006, the ALJ discussed Johnson's lumbar spine studies, progress notes from Johnson's treating physician Dr. Christine Baumgardner, and a variety of

8

medical records that post-dated June 30, 2006. (AR 746-48). An MRI of Johnson's lumbar spine on June 12, 2006 provided the following findings:

> [F]atty marrow changes, otherwise bone signal is normal. There is desiccation and dehydration of the disc spaces present. Cauda equina and conus normal. There is no focal disc herniation, spinal canal stenosis or evidence of neural foraminal narrowing.

(AR 298). The June 12, 2006 MRI provided the impression of "mild degenerative facet changes in the lower lumbar spine. Otherwise unremarkable exam." (AR 298). Five views of Johnson's lumbar spine on May 26, 2006 provided the following findings:

> The vertebral body heights and alignment are maintained. Small anterior osteophytosis are present at several levels in the mid lumbar spine. Disc spaces are maintained and no acute osseous abnormality is seen. Surgical clips are present in the right upper quadrant and a single surgical clip is present in the right lower quadrant.

(AR 299). Treating physician Dr. Baumgardner's Progress Notes often indicated nothing in regard to Johnson's gait and station, but when indicated, her gait and station appeared normal on March 24, 2006 and April 25, 2006. (AR 250-53). In the section of the various Progress Notes entitled "Psychiatric," Johnson's mood and affect were marked "abnormal" in July 2004, December 2004, January 2005, and June 2005. (AR 271-95). She was noted as "tearful" in May 2005 and "very tearful, anxious, and agitated" on October 28, 2005. (AR 259, 275). The "Psychiatric" section of her Progress Notes, specifically mood and affect, was marked "normal" in November 2004, December 3, 2004, July 2005, October 11 and 26, 2005, March 2006, and April 2006. (AR 246-97).

Dr. Dzung H. Dinh, who evaluated Johnson at various times, physically examined Johnson on June 19, 2006, during which time Johnson could walk on her heels and toes without difficulty, she had slight decrease in hip flexor

9

strength secondary to low back pain, she had a positive straight leg raise on the left at 60 degrees, and she had increased pain with hyperextension and lateral rotation to the right and left. (AR 366). Johnson rated her low back pain at a 7/10. (AR 559). Dr. Dinh recommended that Johnson receive an epidural steroid injection. (AR 366). On October 23, 2006, Dr. Dinh noted that a home TENS unit[6] somewhat helped Johnson's back pain along with the use of Flexeril. (AR 554). On December 27, 2006, Dr. Dinh noted that Johnson was using a TENS unit, Flexeril, and Darvocet for pain control. (AR 553). When at Dr. Dinh's office on March 19, 2007, Johnson rated her pain at an 8/10. (AR 549). Johnson later rated her low back pain as 8-9/10 on April 3, 2007. (AR 547).

A March 30, 2007 MRI of Johnson's spine provided the impression of "Degenerative facet changes the appearance to show no significant change from previous June 2006 exam." (AR 448). Dr. Dinh noted in a 2009 note to Dr. Baumgardner that the Discogram Johnson underwent was negative. (AR 711).

As for the medical records the ALJ reviewed that post-dated June 30, 2006, the ALJ acknowledged that there was evidence of deterioration in Johnson's condition after her two reported "injuries" (the Discogram and pelvic traction) in 2007. (AR 747). The ALJ explained, however, that there was no basis to relate the later records back to the time prior to June 30, 2006, and that the records for the second half of 2006 and early 2007 continued to show mild findings which were not consistent with complete disability. (AR 747). Dr. Vaughn Hanna's physical examination of Johnson on April 18, 2007 found "Lumbar spine flexion 80 degrees with mild pain" and "[s]traight leg raise test negative at 70 degrees." (AR 426). Dr. Hanna reported that Johnson was uncomfortable and unable to sit

---

[6] Transcutaneous Electrical Nerve Stimulation unit which is mainly used for "nerve related pain conditions. It works by sending stimulating pulses across the surface of skin and along the nerve strands." tensunit.com (visited Feb 13, 2015).

for very long due to pain in her back. (AR 426). Dr. Terrence L. Pencek assessed Johnson on July 10, 2007 and stated that, "Unfortunately, I feel she is overweight and part of her pain could be coming from the excessive weight." (AR 458). On August 14, 2007, Dr. David L. Spencer wrote to Dr. Baumgardner that he saw Johnson for an evaluation of her chronic back and leg symptoms. (AR 460). He stated:

> Unfortunately after taking a detailed history and physical exam and reviewing the MRI scan, I am convinced that her subjective complaints of pain are out of proportion to any objective findings of abnormality and therefore any surgical intervention in the lumbar spine is ill-advised.

(AR 460). The physical examination of Johnson showed that "Flexion/extension of the lumbar spine is not particularly painful or limited. Straight leg raising is negative and motor, sensory and reflex testing is unremarkable." (AR 461).

The ALJ explained that his decision considered the effect obesity had on Johnson's ability to perform routine movement and necessary physical activity within a work environment. (AR 747). Regarding Johnson's credibility, the ALJ listed the various treatments Johnson received and noted that while such treatments weighed in favor or her allegations of pain to some degree, the "usual objective signs of severe pain were not indicated in the record, such as abnormal weight loss or muscle atrophy." (AR 747). The ALJ rejected the significance of the fact that Johnson used a TENS unit after the date she was last insured, noting that she only underwent psychiatric clearance for it about 14-15 months after the expiration of the date she was last insured.[7] (AR 747). Finally, while discussing Johnson's credibility, the ALJ emphasized that the record showed that Johnson's

---

[7] As will be discussed in further detail below, it appears that the ALJ was referring to the spinal cord stimulator that was surgically implanted into Johnson in November 2007 and not the TENS unit she began to use some time after June 30, 2006.

11

ability to perform daily activities deteriorated significantly only after her Discogram in January 2007. (AR 747).

As for Johnson's mental health, the ALJ discussed Johnson's own accounts of how long her depressive symptoms impacted her functioning, therapists' progress notes, and a consultative psychological evaluation done in August 2006. In May 2004 she was assessed as having recurrent and chronic major depressive disorder. (AR 188). Her November 3, 2005 Intake Evaluation at Vera French Community Mental Health Center indicated Johnson's social history to include that she had not worked since January 2005 because of job stress and some problems with her boss whom she had befriended. (AR 226). The Intake Evaluation indicated an Axis I diagnosis of Major Depressive Disorder. (AR 226). In the August 23, 2006 Psychological Report done by Dr. Gerald L. Spence, Ph.D., Johnson reported that she had significant problems with depression in the past and that she thought she went through that for about 15 months. (AR 400). She said her depression was related to her job at the time. (400). At the time of Dr. Spence's Report, Johnson denied depressive symptoms and denied any depression at that time. (AR 400).

The ALJ noted Johnson's independent and effective performance of routine daily activities that Dr. Spence found her social skills were sufficient to relate to others appropriately, and that the limitations placed in the RFC were more generous than those found by the State Agency in September 2006. The ALJ explained that there was a need for a low stress job involving little or no change in the work routine given that Dr. Spence and the State Agency reports assigned to Johnson residual difficulties dealing with stress. (AR 748). In Johnson's Mental Residual Functional Capacity Assessment dated September 5, 2006, she was rated as "not significantly limited" in all but the following: 1) The ability to complete a normal workday and workweek without interruptions from

psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (she was "moderately limited"); and 2) The ability to respond appropriately to change in the work setting (she was "moderately limited"). (AR 418-19).

At Step Four, the ALJ determined that Johnson was unable to perform any past relevant work. (AR 748).

At Step Five, the ALJ considered Johnson's age, education, work experience, and RFC in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2, and the opinion of the VE to find that there were jobs that existed in significant numbers in the national economy that Johnson could have performed, namely, housekeeper, office helper, and photocopy machine operator. (AR 749). Thus, the ALJ determined that Johnson was not disabled. (AR 750).

IV

Johnson argues three points: 1) the ALJ failed to consider the combined effects of each of Johnson's severe impairments; 2) the ALJ failed to adequately consider Johnson's retrospective medical evidence and determine whether it is evidence of her symptomology prior to the expiration of the date last insured; and 3) the ALJ improperly discredited Johnson's subjective complaints as they relate to pain. The Court will address each argument in turn.

Pursuant to 42 USC § 405(g), the Commissioner's findings must be sustained by the Court if they are supported by "substantial evidence." 42 USC § 405(g). The entire administrative record must be reviewed for substantial evidence which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Skinner v Astrue*, 478 F3d 836, 841 (7th Cir 2007), quoting *Richardson v Perales*, 402 US 389, 401 (1971). The Court may not substitute its judgment for that of the ALJ. *Schmidt v Apfel*, 201 F3d 970, 972 (7th

13

Cir 2000). Furthermore, the Court will not review the credibility determinations of the ALJ unless the determinations lack an explanation or support in the record. *Elder v Astrue*, 529 F3d 408, 413-14 (7th Cir 2008). The ALJ must "sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence . . . and to enable us to trace the path of the ALJ's reasoning." *Carlson v Shalala*, 999 F2d 180, 181 (7th Cir 1993).

## A

Johnson first argues that the ALJ failed to consider the combined effects of each of Johnson's severe impairments where the ALJ failed to consider that Johnson was experiencing significant symptoms of depression between January 10, 2005 and up to three months prior to her date last insured. Johnson argues that her ongoing depression would have a negative impact on the treatment of her physical impairments and that just because her symptoms of depression had improved over a period prior to June 30, 2006 does not mean that the combination of her other impairments also improved. The Commissioner counters that the ALJ's RFC finding and hypothetical question accounted for Johnson's combined physical and mental impairments and the ALJ considered Johnson's combined physical and mental impairments though he did not have to do so where, based upon her own pronouncements, there would have been no overlap between Johnson's severe depression and severe back impairment. The Commissioner further argues that Johnson does not cite to any evidence that the ALJ failed to consider.

It is clear from even a cursory reading of the ALJ's opinion that he considered the *combined* effects of Johnson's impairments of depression and back pain. He explained that Johnson's impairments would be considered together for the time period at issue, and his lengthy discussion of Johnson's severe impairments and their combined effects is reflected in his RFC finding. See *Sims*

*v Barnhart*, 309 F3d 424, 432 (7th Cir 2002) (finding the ALJ's evaluation acceptable and that he considered the combined effects of the claimant's impairments because he ensured that the VE took into account all of the claimant's impairments when determining whether jobs existed that the claimant could perform). Specifically, the ALJ explained how the RFC accommodated Johnson's complaints of pain and limited motion to the extent supported by the objective record and credibility factors, and he explained that Johnson's residual difficulties dealing with stress translated into a need for a low stress job involving little or no change in the work routine (which was reflected in the RFC insofar as it limited Johnson to "simple and repetitive tasks involving little or no change in work routine"). (AR 745). The ALJ did not fail to consider the combined effects of Johnson's severe impairments.

B

Johnson next argues that the ALJ failed to adequately consider Johnson's retrospective medical evidence and determine whether it is evidence of her symptomology prior to the expiration of the date last insured. She argues that while the ALJ emphasized how Johnson's back pain became worse after the January 2007 Discogram (6 months after the date she was last insured), Johnson also testified to significant back pain prior to the Discogram in January 2007 and that the Discogram was part of the treatment for her significant back pain that pre-dated June 30, 2006. Johnson also argues that the symptoms she had prior to June 30, 2006 and the test results pre-dating that period are consistent with her symptoms following June 30, 2006, and so the ALJ should have considered the medical notes and diagnoses following June 30, 2006. The Commissioner counters that Johnson's condition in January 2007 is simply not relevant to her condition on June 30, 2006, and that in any event, the post-date-last insured

15

evidence supports the ALJ's decision that Johnson was not disabled as of June 30, 2006.

A retrospective diagnosis is a medical opinion of the claimant's impairments which relates back to the covered period. *Estok v Apfel*, 152 F3d 636, 638 (7th Cir 1998). A retrospective diagnosis may be considered only if it is corroborated by evidence contemporaneous with the eligible period. Id at 640. Here, there was no retrospective diagnosis, but instead, continuing treatment for Johnson's continued complaints of back pain that, from the evidence of record, worsened after June 30, 2006. Johnson essentially argues that the level of her pain and resulting alleged disability post-June 30, 2006 should relate back to the covered period. However, the ALJ specifically discussed Johnson's back pain to the extent it was supported in the objective evidence and to the extent she credibly reported experiencing it up until the date last insured.

The ALJ rejected the relation-back of Johnson's records, though he still acknowledged that Johnson's condition following the Discogram and pelvic traction deteriorated. He emphasized that Johnson did testify that the January 2007 Discogram marked the cessation of her doing no housework or outdoor work. (AR 37). Further, the ALJ identified discrete parts of Johnson's medical record that post-dated June 30, 2006 in support of his finding that Johnson was not completely disabled during the relevant period. Johnson would have the Court do what it may not; the Court may not substitute its judgment for that of the ALJ. *Schmidt*, 201 F3d at 972. The ALJ articulated his assessment of the evidence sufficiently for the Court to trace the path of his reasoning in rejecting a finding of disability on or before June 30, 2006. *Carlson*, 999 F2d at 181. Johnson states that this matter should be remanded to require the ALJ to examine the medical records following the date last insured to determine whether they support her complaints of impairment prior to the date last insured. Remand for

that reason would be superfluous, as the ALJ already did what Johnson now requests.

## C

Johnson's final argument is that the ALJ improperly discredited Johnson's subjective complaints as they relate to pain. Johnson takes issue with the ALJ's statement (one of his articulated reasons for concluding that relevant credibility factors failed to support a finding of complete disability) that there were no hospital or emergency room visits for pain between the alleged onset date and expiration of the date last insured. Johnson argues that the assertion that she had not sought treatment for her lumbar spine pain prior to June 30, 2006 is simply not true. She also takes issue with the ALJ's statement that the "usual objective signs of severe pain were not indicated in the record, such as abnormal weight loss or muscle atrophy." (AR 747). She argues that the ALJ did not indicate where he derived his expertise in such objective records, and that the usual objective findings of positive straight leg raise, decreased range of motion, and pain during a range of motion test were made very clear in the record. Johnson also argues that her activities of daily living do not discredit her subjective complaints of pain. Finally, she argues that her statements regarding her impairments were consistent throughout the record. The Commissioner counters that Johnson's argument regarding emergency room and hospital visits misses the mark, as the ALJ found that Johnson did receive treatment. The Commissioner disputes that it was the ALJ who wrongly found objective findings of pain to be lacking where Johnson's own doctor explained that "subjective complaints of pain [were] out of proportion to any objective findings of abnormality . . . ." (AR 460). The Commissioner also argues that the ALJ did not reinvent the facts as to Johnson's daily activities where he did not specify the

degree to which Johnson participated in her activities, but rather that she participated in them to some degree.

Determinations of credibility made by the ALJ will not be overturned unless the findings patently wrong. *Shideler v Astrue*, 688 F3d 306, 310-11 (7th Cir 2012). "Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed." *Sims v Barnhart*, 442 F3d 536, 538 (7th Cir 2006) (citation omitted). SSR 96–7p instructs that when "determining the credibility of the individual's statements, the adjudicator must consider the entire case record," and that a credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." An ALJ should consider elements such as objective medical evidence of the claimant's impairments, the daily activities, allegations of pain and other aggravating factors, "functional limitations," and treatment (including medication). *Scheck v Barnhart*, 357 F3d 697, 703 (7th Cir 2004); *Rice v Barnhart*, 384 F3d 363, 371 (7th Cir 2004).

Here, the ALJ specifically found that, "Relevant credibility factors fail to support a finding of complete disability as of the expiration of the date last insured." (AR 747). While he considered Johnson's use of pain medication, cortisone injections, a trigger point injection, and epidurals, he also considered the fact that Johnson did not undergo physical therapy and was not referred to a pain clinic, and that she cared for personal needs, cooked, cleaned, dusted, did laundry, and shopped. (AR 747). The ALJ explained that the record showed Johnson's ability to perform daily activities deteriorated significantly only after she hurt her back with the January 2007 Discogram. (AR 747). The ALJ also explained Johnson's attempt to return to work in early 2006 and how the job included lifting children so that it aggravated her back pain. Contrary to

Johnson's assertion that the ALJ was reinventing the facts to fit his decision, he was up front about the objective and subjective evidence in the record. The ALJ's credibility determination sufficiently contained both explanation and support in the record. *Shideler*, 688 F3d at 311. His findings are not patently wrong. *Skarbek v Barnhart*, 390 F3d 500, 504-05 (7th Cir 2004).

One particular part of the ALJ's Decision pertaining to his credibility determination, however, warrants further discussion. In his Decision, the ALJ stated:

> The Appeals Council thought it was significant that the claimant later used a TENS unit after the expiration of her date last insured (June 2006), but she only underwent psychiatric clearance for it in September 2007 (Exhibit B-17F/1), which was about 14-15 months after the expiration of the date last insured.

(AR 747). It appears that the ALJ was actually referencing the surgical implantation of Johnson's spinal cord stimulator which occurred on November 9, 2007. (AR 498). While there is no particular date indicated in the record as to when Johnson first used the TENS unit, reference to her use of it was made as early as October 23, 2006 in a note from Dr. Dinh which is significantly closer in time after the expiration of the date last insured than the surgical implantation of the stimulator. (AR 554). Nevertheless, that error is harmless here where the ALJ addressed the evidence of record which was prior to the date Johnson was last insured as well as the evidence of record which post-dated June 30, 2006 in discussing his credibility determination, where he addressed the other factors relevant to a credibility determination, and where Johnson's use of the TENS unit appears to have commenced after June 30, 2006.[8] In other words, the Court is convinced that the ALJ would reach the same result if the case were remanded to

---

[8] Johnson acknowledges in her Motion for Summary Judgment that the record does not indicate precisely when the TENS unit was prescribed. (Doc. 10-1 at pg. 16).

19

consider the correct timing of Johnson's use of the TENS unit. Ultimately, the ALJ's credibility determination was not patently wrong.

## V

For the reasons set forth above, the Court recommends that the Plaintiff's Motion for Summary Judgment (Doc. 10) be DENIED and the Commissioner's Motion for Summary Affirmance (Doc. 13) be GRANTED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk within fourteen (14) working days after service of this Report and Recommendation. FRCP 72(b)(2); 28 USC § 636(b)(1). Failure to object will constitute a waiver of objections on appeal. *Johnson v Zema Systems Corp*, 170 F3d 734, 739 (7th Cir 1999); *Lorentzen v Anderson Pest Control*, 64 F3d 327, 330 (7th Cir 1995).

Entered on February 17, 2015.

s/Jonathan E. Hawley<br>U.S. MAGISTRATE JUDGE